UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| POTOMAC RIVERKEEPER, INC., <br> d/b/a POTOMAC RIVERKEEPER NETWORK <br> 3070 M Street NW <br> Washington, D.C. 20007 <br><br>         Plaintiff <br><br> v. <br><br> VERSO LUKE LLC <br> 300 Pratt Street <br> Luke, Maryland 21540 <br> Allegany County <br><br> Serve on: Cogency Global Inc. <br> 1519 York Rd. <br> Lutherville, Maryland 21093 <br><br> VERSO CORPORATION <br> 300 Pratt Street <br> Luke, Maryland 21540 <br><br> Serve on: Cogency Global Inc. <br> 850 New Burton Rd., Suite 201 <br> Dover, Delaware 19904 <br><br>         Defendants. | Case No._____ |

**COMPLAINT FOR INJUNCTIVE RELIEF AND CIVIL PENALTIES**

Plaintiff Potomac Riverkeeper, Inc., d/b/a Potomac Riverkeeper Network ("Plaintiff" or "PRKN"), by and through its counsel, the Environmental Integrity Project ("EIP"), for its Complaint against Verso Corporation and Verso Luke LLC (collectively, "Defendants" or "Verso"), allege as follows:

## NATURE OF THE CASE

1. This is a civil action for injunctive relief, civil penalties, and costs and fees, brought under the citizen suit provision of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.*, as amended by the Hazardous and Solid Waste Amendments of 1984 (hereinafter "RCRA"). Plaintiff alleges serious and ongoing violations of Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), at the Luke Paper Mill (the "Mill"), located at 300 Pratt Street, Luke, Maryland, 21540. These violations, which relate to the discharge or release of Mill wastes into the North Branch of the Potomac River (the "River"), are placing people and the environment at significant and immediate risk from high levels of contaminants.

2. Defendant Verso Luke LLC operated the now-closed Mill and its facilities in both Allegany County, Maryland and Mineral County, West Virginia. Defendant Verso Luke LLC is a wholly owned subsidiary of Verso Corporation.

3. Verso Corporation owns the Mill and has exercised operational control over the Mill at all times relevant to this Complaint.

4. As detailed below, Defendants handle, transport, treat, store, and/or dispose of solid and/or hazardous wastes generated from the paper pulping process in a manner that may present an imminent and substantial endangerment to health or the environment, pursuant to RCRA.

5. Defendants also have handled, transported, treated, stored, and/or disposed of coal combustion waste (hereinafter "coal ash"), which is a solid waste, in a manner that may present an imminent and substantial endangerment to health or the environment, pursuant to RCRA.

6. On November 19, 2019, Plaintiff sent a Notice of Intent to Sue letter ("NOI") for violations of RCRA Section 7002(a)(1)(B) to Verso Corporation and the registered agent and Environmental Manager of Verso Luke LLC and to other recipients required to receive notice by 42 U.S.C. § 6972(b)(2) and 40 C.F.R. § 254.2 ("Verso NOI"). (Attached as Exhibit 1 and incorporated by reference herein.)

7. On February 11, 2020, Plaintiff sent a letter to Verso Luke LLC with the NOI enclosed and incorporated in its entirety by reference. (Attached as Exhibit 2.) In that letter, counsel for Plaintiff specifically notified Verso Luke LLC that the violations alleged in the NOI were violations Plaintiff intended to pursue against both Verso Corporation and Verso Luke LLC. Plaintiff also sent this letter, without the NOI enclosure, to those entities required to receive notice pursuant to 40 C.F.R. § 254.2.

8. Section 7002(a) and (b)(2) of RCRA, 42 U.S.C. §§ 6972(a) and (b)(2), state that an action may be commenced in the district court where the endangerment may occur, 90 days after the plaintiff has provided notice of the endangerment.

9. It has been more than 90 days since Plaintiff provided the Verso NOI to Verso Corporation and the registered agent and Environmental Manager of Verso Luke LLC, along with the other required entities.

10. Upon information and belief, the handling of the wastes generated at the Mill, which are causing the imminent and substantial endangerment, has been ongoing for at least the last five years and with direct knowledge since April 2019.

11. To prevent the further risk of harm from the improper handling of solid and/or hazardous wastes at the Mill in the future, Plaintiff seeks an Order requiring Defendants to investigate their entire property on which the Mill and its facilities are located to identify all

potential sources of contamination that may be discharging or releasing to the River and therefore causing imminent and substantial endangerment to health or the environment.

12. To reduce the substantial risk of harm resulting from the handling of solid and/or hazardous wastes at the Mill, Plaintiff seeks an Order requiring Defendants to stop discharging pulping liquors, coal ash (and their constituents), and/or other solid or hazardous wastes that may cause imminent and substantial endangerment to health or the environment, and to assess and remediate the harm caused by these violations.

13. Finally, Plaintiff seeks an Order assessing civil penalties against Defendants, awarding Plaintiff the costs of litigation, including reasonable attorney and expert witness fees, and providing any further relief that the Court deems appropriate.

## JURISDICTION

14. This Court has subject matter jurisdiction over this action pursuant to the citizen suit provision in Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), and 28 U.S.C. § 1331 (federal question jurisdiction).

15. RCRA Section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), allows citizens to bring suit in order to stop an "imminent and substantial endangerment to health or the environment." Any person may commence an action against "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

16. This Court has personal jurisdiction over the Defendants because they have an interest in property in Maryland. Defendant Verso Luke LLC has conducted business in Maryland at all times relevant to the Complaint. Both Defendants have purposely availed

themselves of Maryland laws by seeking permits for the operation of, and discharges from, the Mill. Defendants have also contributed to the handling, storage, and/or disposal of solid and/or hazardous wastes which may present an imminent and substantial endangerment to health or the environment through their operation of the Mill, located in this district.

17. Pursuant to RCRA Section 7002(a)(1)(B) and (b)(2)(A), on November 19, 2019, Plaintiff gave notice to all required parties, including: 1) Defendants; 2) the State; and 3) EPA. Plaintiff is entitled to file the present action at any time after 90 days from the date of the Verso NOI.

18. The Verso NOI satisfied the regulatory requirements for NOIs, per 40 C.F.R. part 254.

19. EPA has not commenced and is not diligently prosecuting an action to abate the imminent and substantial endangerment to health and the environment alleged in Plaintiff's NOI. 42 U.S.C. § 6972(b)(2)(B). EPA also is not engaged in any of the actions under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) described in 42 U.S.C. 6972(b)(2)(B) with respect to the conditions set forth herein.

20. The State of Maryland has not commenced and is not diligently prosecuting a civil action against Verso under RCRA subsection 7002(a)(1)(B) or engaging in any actions under CERCLA described in subsection 7002(b)(2)(C)(ii) or (ii). 42 U.S.C. § 6972(b)(2)(C).

21. The endangerment described in the Verso NOI is continuing at this time or is reasonably likely to continue, because Defendants have failed to take corrective actions sufficient to abate the endangerment conditions.

## VENUE

22. Pursuant to RCRA Section 7002(a), 42 U.S.C. § 6972(a), venue is correct because the alleged endangerment to the River occurred and continues to occur within this district.

## THE PARTIES

23. Plaintiff PRKN is a 501(c)(3) non-profit organization with three regional Waterkeeper branches: Potomac Riverkeeper, Upper Potomac Riverkeeper, and Shenandoah Riverkeeper. PRKN's mission is to protect the public's right to clean water in our rivers and streams and to stop pollution to promote safe drinking water, protect healthy river habitats, and enhance public use and enjoyment. Many members of PRKN are avid kayakers, anglers, bird-watchers, business owners, and other users of the Potomac and Shenandoah rivers and their tributaries. These members have been injured and continue to be injured by Verso's handling of solid and/or hazardous wastes at the Mill that may have created and may continue to create an imminent and substantial endangerment to the River, as described herein, as the endangerment threatens members' use and enjoyment of the River and its tributaries and continues to present a potential human health risk.

24. Plaintiff is a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15). Plaintiff has standing because its members are being harmed by Defendants' waste management and/or manufacturing activities, the relief requested would redress these harms, and the interests Plaintiff seeks to protect are germane to PRKN's purpose.

25. Neither the claims asserted in this Complaint, nor the relief requested, require the participation of the individual members of PRKN in this action.

26. Defendants Verso Corporation and Verso Luke LLC are, respectively, a Delaware corporation and a Delaware limited liability company.

27. Verso Luke LLC is registered to conduct business in the State of Maryland.

28. Verso Luke LLC is a wholly owned subsidiary of Verso Corporation.

29. Verso Luke LLC has listed principal offices at 6775 Lenox Center Court, Memphis, Tennessee 38115 and 8540 Gander Creek Drive, Miamisburg, Ohio 45342.[1]

30. Verso Corporation is headquartered at 8540 Gander Creek Drive Miamisburg, Ohio 45352.

31. Verso Corporation and Verso Luke LLC each are a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

## LEGAL REQUIREMENTS

32. Federal regulation of solid waste is achieved through implementation of RCRA, which was enacted in 1976 as an amendment to the Solid Waste Disposal Act of 1965.

33. Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), provides authority for PRKN to bring suit against "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

34. RCRA defines "person" to include an "individual," "corporation," "partnership," or "association," in addition to other terms. 42 U.S.C. § 6903(15).

35. The term "disposal" "means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that

---

[1] Verso Luke LLC's Limited Liability Company Registration in Maryland lists the Memphis address as a principal office address, but the West Virginia Secretary of State Business Entity Details lists the Miamisburg address as Verso Luke LLC's principal office address.

such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *Id.* § 6903(3).

36. The term "solid waste" "means any garbage, refuse, sludge . . . and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations . . . ." *Id.* § 6903(27).

37. The term "hazardous waste" "means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may-- (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." *Id.* § 6903(5).

38. Any person who is liable under RCRA Section 7002(a)(1)(B) can be subject to a civil penalty of up to $75,867 per day per violation that occurred after November 2, 2015, where penalties are assessed on or after January 13, 2020. 42 U.S.C. § 6972(a) (authorizing the district court to apply any appropriate civil penalties under section 6928(a) and (g)), 6928(g) (providing for civil penalty of up to $25,000 for each day of the violation); 40 C.F.R. § 19.4 tbl 1 (updating $25,000 per day civil penalty for inflation).

## FACTUAL ALLEGATIONS

*Luke Paper Mill*

39. The Mill is located in Luke, Maryland, and Beryl, West Virginia, with facilities on both sides of the River.

40. The manufacturing operations of the Mill are located on the Maryland side and the waste management part of the Mill, including an ash lagoon, a million-gallon black liquor

above-ground storage tank ("AST"), three 150,000-gallon green liquor ASTs, one 350,000-gallon mud washer liquor AST, one 1,065,000-gallon white liquor clarifier AST, and one million-gallon white liquor AST, is located on the West Virginia side, along with a lime kiln and a wood yard.

41. Maryland's jurisdictional boundaries include the North Branch of the Potomac River, beginning at the low-water mark of the southern, West Virginia shore.

42. The Mill was founded in 1888 and purchased by Verso Corporation in 2015.

43. The Mill manufactured paper products until plant operations ceased on June 30, 2019.

44. During operation, the Mill generated and stored pulping liquors, byproducts in the paper pulping process, in ASTs on Verso's property on the West Virginia side of the River.

45. During operation, the Mill burned coal to produce energy and stored the resulting coal ash in a pond on Verso's property on the West Virginia side of the River.

*Receiving Water Body*

46. The North Branch of the Potomac River is the receiving water body of the Mill's discharges.

47. The River has a Designated Use Class I-P, which means that certain water quality standards apply to protect the River for water contact recreation, fishing, aquatic life, wildlife and the public water supply. COMAR 26.08.02.08R.

48. The water quality standard for pH for Class I-P waters is between 6.5 and 8.5 standard units ("s.u."). COMAR 26.08.02.03-3A(4), B(1).

49. The water quality standard for dissolved oxygen is not less than 5 milligrams per liter ("mg/L") at any time. COMAR 26.08.02.03-3A(2), B(1).

50. Water quality criteria for aquatic life for arsenic and mercury are: 340 micrograms per liter ("µg/L") arsenic (acute), 150 µg/L arsenic (chronic); and 1.4 µg/L mercury (acute), 0.77 µg/L mercury (chronic).[2]

51. Drinking water standards for arsenic, mercury, and sulfates are: 10 µg/L, 2 µg/L, and 500,000 µg/L[3] respectively.

52. The Upper North Branch Potomac River watershed was listed in 2012 with a localized impairment for sulfates, but a TMDL has not yet been completed for sulfates.

53. The River is within the Chesapeake Bay watershed, which is impaired for nitrogen, phosphorus, and sediment. The River is subject to the Chesapeake Bay TMDL, which establishes pollution loads for nitrogen, phosphorus, and sediment that reach the Chesapeake Bay.

*Contamination Levels*

54. On April 6, 2019, an angler reported to Maryland Department of the Environment ("MDE") seeing pools of "pure black waste" on the West Virginia side of the River near the Mill.

55. On April 9, 2019, an MDE inspector observed a black substance leaking into the River and sampled a pool of seepage to measure pH and dissolved oxygen.

---

[2] For these parameters, Maryland uses the same water quality criteria as the federal criteria. U.S. EPA, *National Recommended Water Quality Criteria – Aquatic Life Criteria Table*, https://www.epa.gov/wqc/national-recommended-water-quality-criteria-aquatic-life-criteria-table#main-content; U.S. EPA, *National Primary Drinking Water Regulations*, https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations#Organic; COMAR 26.08.02.03-2 Numerical Criteria for Toxic Substances in Surface Waters, Table 1 Toxic Substances Criteria for Ambient Surface Waters – Inorganic Substances, http://www.dsd.state.md.us/comar/comarhtml/26/26.08.02.03-2.htm

[3] This level is based on the World Health Organization guidelines for drinking-water quality. *See* World Health Organization, *Sulfate in Drinking-water, Background Document for development of WHO Guidelines for Drinking-water Quality*, https://www.who.int/water_sanitation_health/dwq/chemicals/sulfate.pdf. EPA has also established a health-based drinking water advisory for sulfate at the same level (500 mg/L or 500,000 µ/L). U.S. EPA, *Drinking Water Advisory: Consumer Acceptability Advice and Health Effects Analysis on Sulfate* (Feb. 2003).

56. The sample collected on April 9, 2019 had a pH of 11.8 s.u. and dissolved oxygen concentration of 1.65 mg/L.

57. The pH and dissolved oxygen levels measured by the MDE inspector on April 9, 2019 violate water quality standards.

58. The MDE inspector returned on April 25, 2019 to collect water samples in a contaminated pool at the location of the angler's report of black waste.

59. The MDE water samples contained arsenic levels of 400 µg/L, mercury levels of 10 µg/L, and sulfate levels of 2,610,000 µ/L.

60. MDE's water sample results show that levels of arsenic and mercury exceeded water quality criteria for aquatic life.

61. MDE's water sample results show that levels of arsenic, mercury, and sulfate exceeded drinking water standards.

62. The MDE inspector also collected water samples from an area upstream of the seepage, which resulted in non-detect for arsenic and mercury, and 97,100 µg/L sulfate.

63. During the April 25, 2019 investigation, the MDE inspector measured pH and dissolved oxygen of a discolored pool at the location of the April 6, 2019 report of black waste, with results of 10.76 s.u. and 0.67 mg/L respectively.

64. The pH and dissolved oxygen levels measured by the MDE inspector on April 25, 2019 violate water quality standards.

65. On or around June 29, 2019, a citizen reported to MDE that he saw a dead rainbow trout in the rocks in the River behind the Mill, that he saw a black liquid and white substance covering the rocks, and that he smelled a "sulfuric/rotten egg smell" when wetting his hands with water from the River.

66. The June 29, 2019 citizen report concerned the same observable area of black waste discharging into the River as first reported by the angler on April 6, 2019 and subsequently investigated by MDE.

67. On September 10, 2019, the Upper Potomac Riverkeeper (the "Riverkeeper") visited the site and conducted sampling in the same area to test for, among other pollutants, arsenic, boron, and mercury.

68. The Riverkeeper's samples contained arsenic levels of 1330 µg/L, boron levels of 2,160 µg/L, and mercury levels of 4 µg/L.

69. The Riverkeeper's water sample results show that levels of arsenic and mercury exceeded drinking water standards and water quality criteria.

70. High levels of sulfates and high pH are consistent with pulping liquors.

71. High levels of arsenic, mercury, and boron are consistent with coal ash.

72. According to RCRAinfo.epa.gov, Verso is a large generator of hazardous waste pursuant to RCRA and generated or generates arsenic (EPA hazardous waste code D004[4]) and mercury (EPA hazardous waste code U151[5]).

73. Upon information and belief, it is possible that the arsenic and mercury present in the black waste discharge derive from either the manufacturing process or waste management practices at the Mill that may be unrelated to coal ash management.

---

[4] D-listed wastes are characteristically hazardous, meaning they are hazardous because they exhibit the characteristics of ignitability, corrosivity, reactivity, or toxicity. A hazardous waste number of D004 indicates that the waste is hazardous due to the characteristic of toxicity.

[5] For a waste to be designated a U-listed hazardous waste, it must contain one of the chemicals listed on the U list, the chemical in the waste must be unused, and the chemical must be in the form of a commercial chemical product.

*Harmful Effects of Pulping Liquors*

74. White liquor, green liquor, and black liquor are corrosive pulping liquors that are by-products of the paper-making process.

75. Multiple forms of contact with pulping liquors are hazardous to both health and the environment.

76. Exposure to white liquor, green liquor, or black liquor may cause the following: severe eye burns; severe skin burns, with redness, swelling, and blistering; nausea, vomiting, swelling of the throat, and abdominal pain; severe respiratory tract irritation; and, at high concentrations, chemical pneumonitis and pulmonary edema.[6]

*Harmful Effects of Pollutants Detected*

77. Arsenic is associated with an increased risk of cancer in the liver and the bladder in humans.[7] Inhalation of inorganic arsenic can cause a sore throat or irritated lungs and increase the risk of lung cancer.[8]

78. In fish, arsenic causes liver poisoning and developmental abnormalities.[9] Arsenic has a tendency to bioaccumulate in aquatic communities and impact higher trophic level organisms in the area. Elevated arsenic tissue concentrations are associated with liver tissue death, developmental abnormalities, and reduced growth.[10]

---

[6] NewPage Corporation, *Material Safety Data Sheet, White liquor*, (June 30, 2005) at 1–2; NewPage Corporation, *Material Safety Data Sheet, Green liquor*, (June 30, 2005) at 1–2; NewPage Corporation, *Material Safety Data Sheet, Black liquor*, (June 30, 2005) at 2.
[7] EPA, *Steam Electric Power Generation Point Source Category: Final Detailed Study Report*, EPA 821-R-09-008 (Oct. 2009), 6-3, available at https://www.epa.gov/sites/production/files/2015-06/documents/steam-electric_detailed_study_report_2009.pdf
[8] ATSDR, *Arsenic – ToxFAQs*, CAS # 7440-38-2, (Aug. 2007) 1-2, *available at* https://www.atsdr.cdc.gov/toxfaqs/tfacts2.pdf.
[9] EPA, *Steam Electric Power Generation Point Source Category: Final Detailed Study Report*, *supra* note 5, at 6-3.
[10] *Id.* at 6-5.

79. Mercury is a highly toxic compound that represents an environmental and human health risk even in small concentrations.[11] Human exposure to mercury levels above the EPA Maximum Contaminant Level, 2 µg/L, for relatively short periods can cause kidney damage.[12]

80. Mercury causes metabolic changes, central nervous system abnormalities, and abnormalities in the liver and kidneys of biota with elevated levels.[13] Bacteria found in river sediments can convert mercury to methylmercury through a process called methylation.[14] Methylmercury is an organic form of mercury that readily bioaccumulates in fish and other organisms and is associated with high rates of reproductive failure.[15]

81. Sulfates at levels above 500 mg/L (500,000 µ/L) have been associated with a laxative response in humans and above 2,000 mg/L (2,000,000 µ/L) "is almost certain to produce discernible physiological effects."[16]

## CAUSES OF ACTION

82. Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Complaint and the attachments to this Complaint.

83. Pursuant to RCRA Section 7002(a)(1)(B), having given the required notice, citizens may commence a citizen suit against "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any

---

[11] *Id.*
[12] *Id.* at 6-4.
[13] *Id.*; ATSDR, *Mercury – ToxFAQs*, CAS # 7439-97-6, (Apr. 1999) 1, *available at* https://www.atsdr.cdc.gov/toxfaqs/tfacts46.pdf.
[14] EPA, *Steam Electric Power Generation Point Source Category: Final Detailed Study Report*, *supra* note 5, at 6-5.
[15] *Id.*
[16] EPA, *Drinking Water Advisory: Consumer Acceptability Advice and Health Effects Analysis on Sulfate*, EPA 822-R-03-007, 15-16, 20 (Feb. 2003), https://www.epa.gov/sites/production/files/2014-09/documents/support_ccl_sulfate_healtheffects.pdf.

solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

84. Defendants Verso Corporation and Verso Luke LLC are each a "person" as that term is defined in 42 U.S.C. § 6903(15).

85. Pulping liquors, including white liquor, green liquor, and black liquor, are "solid waste" as that term is defined in 42 U.S.C. § 6903(27) because they are "discarded material," which includes liquid or semisolid material resulting from industrial or commercial operations. 42 U.S.C. § 6903(27).

86. Coal ash is "solid waste" as that term is defined in 42 U.S.C. § 6903(27) because it is "discarded material," which includes solid material resulting from industrial or commercial operations. 42 U.S.C. § 6903(27).

87. Upon information and belief, it is possible that the mercury (hazardous waste number U151) and arsenic (hazardous waste number D004) present in the discharge may be, partially or wholly, the result of improperly disposed hazardous wastes.

88. Other wastes disposed on-site that may be present in the discharge of black waste to the River are "solid waste" or "hazardous waste" as those terms are defined in 42 U.S.C. §§ 6903(5) and (27).

89. Defendants have contributed to and continue to contribute to the handling, storage, transportation, and/or disposal of pulping liquors, coal ash, and/or other solid and hazardous waste, because they handled pulping liquors during the paper-making process; stored pulping liquors in ASTs and coal ash in a coal ash pond on-site; transported pulping liquors from the Mill to the ASTs and coal ash from the Mill to the pond; generated and, on information and belief, may have improperly disposed of hazardous wastes on-site onto unprotected soils and/or

groundwater, and the leaking, spilling, or discharging of these wastes constitutes disposal, as that term is defined in 42 U.S.C. § 6903(3).

90. Based on their corrosiveness, pulping liquors present imminent and substantial endangerment to human health or the environment.

91. Arsenic was detected in the samples at levels over three times the water quality criterion for acute exposure for aquatic life and over 130 times the drinking water standard.

92. Mercury was detected at levels up to five times the drinking water standard and over seven times the water quality criterion for acute exposure for aquatic life.

93. Sulfates were detected at levels over five times the drinking water standard.

94. The levels of pollutants detected may present imminent and substantial endangerment to aquatic life and human health.

95. Defendants' handling, storage, transportation, and/or disposal of pulping liquors, coal ash, and/or solid or hazardous wastes generated from the operation of the Mill may have presented and may be presenting an imminent and substantial endangerment to health and the environment as those terms are used in RCRA Section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B).

96. Defendants are subject to a civil penalty of up to $75,867 per day per violation that occurred after November 2, 2015, where penalties are assessed on or after January 13, 2020. 42 U.S.C. §§ 6972(a), 6928(g); 40 C.F.R. § 19.4 tbl 1.

97. Defendants are liable for all injunctive relief necessary to abate the endangerment, all costs and attorneys and expert witness fees, and any other relief this Court deems appropriate.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(a) Declare that Defendants' past and/or present handling, storage, transportation, and disposal of pulping liquors, coal ash, and/or solid or hazardous wastes generated from the operation of the Mill may have presented, or may be presenting, an imminent and substantial endangerment to public health or the environment in violation of RCRA;

(b) Order injunctive relief requiring Defendants to investigate their entire property on which the Mill and its facilities are located to identify all potential sources of the contamination that may cause imminent and substantial endangerment to health or the environment, including the River to which known discharges are occurring;

(c) Order injunctive relief requiring Defendants to stop discharging pulping liquors, coal ash, their constituents, and/or other solid or hazardous wastes that may present imminent and substantial endangerment to health or the environment;

(d) Order injunctive relief requiring Defendants to assess and remediate the harm caused by their violations;

(e) Assess civil penalties against Defendants;

(f) Award Plaintiff the costs of litigation, including reasonable attorney and expert witness fees, as authorized by 42 U.S.C. § 6972(e).

(g) Grant such other and further relief as the Court deems just and proper.

Date: March 24, 2019

Respectfully submitted,

/s/ *Eric Schaeffer*
Eric Schaeffer (District of Maryland Bar No: 29665)
Mary E. Greene∗
Natalia M. Cabrera*
Environmental Integrity Project
1000 Vermont Avenue, NW, Suite 1100
Washington, DC 20005

---

∗District of Maryland bar applications pending

Telephone: (202) 263-4449
Fax: (202) 296-8822
eschaeffer@environmentalintegrity.org
mgreene@environmentalintegrity.org
ncabrera@environmentalintegrity.org

*Attorneys for Plaintiff Potomac Riverkeeper, Inc., d/b/a Potomac Riverkeeper Network*